# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

ROBERT LOPEZ,

Defendant and Appellant.

S287814

Fifth Appellate District

F085300

Stanislaus County Superior Court

1073884

April 30, 2026

Justice Evans authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Wilson* concurred.

_____

\*      Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. LOPEZ

S287814


Opinion of the Court by Evans, J.


In 2007, appellant Robert Lopez was convicted of the murder of Daniel Morales, assault with a deadly weapon, and participation in a criminal street gang. As to the murder and the assault, the jury imposed enhancements based on the crimes being committed for the benefit of a criminal street gang (Pen. Code,[1] former § 186.22, subd. (b)(1)) and because a principal personally used a firearm causing death (§ 12022.53, subds. (d) & (e)(1).) The convictions stemmed from an incident in which Lopez, then 16 years old, codefendant Manuel Domingo Hernandez, then 24 years old, and two others confronted perceived gang rivals outside a taco truck in Modesto, ultimately resulting in the fatal shooting of Morales.

Subsequently, the Legislature significantly altered the scope of murder liability. (Sen. Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437); Stats. 2018, ch. 1015, § 3.) Among other changes, Senate Bill 1437 amended Penal Code section 188 to require that "a principal in a crime shall act with malice aforethought," which "shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (3).) Under Senate Bill 1437, the Legislature also created a resentencing procedure for defendants who had previously been convicted of murder under prior law. (Former § 1170.95,

---

[1]     All unspecified statutory references are to the Penal Code.

1

added by Stats. 2018, ch. 1015, § 4, subsequently renumbered as § 1172.6 by Stats. 2022, ch. 58, § 10.)

As amended in 2021 by Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), section 1172.6 makes eligible for resentencing persons convicted of murder pursuant to any "theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a).) Under section 1172.6, petitioners can seek resentencing when three conditions are met: (1) "[a] complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine"; (2) "[t]he petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder"; and (3) "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subds. (a)(1)–(3).)

In January 2019, Lopez filed a pro per petition under what is now section 1172.6, alleging that he should be resentenced because he could not now be convicted of murder because of the changes to sections 188 and 189. The trial court, accepting the People's concession, concluded that Lopez had made a prima facie showing of resentencing eligibility. Following an evidentiary hearing under section 1172.6, subdivision (d)(3), the court denied the petition on the ground that Lopez was guilty of

murder as the actual killer or a direct aider and abettor. Lopez appealed.

The Court of Appeal affirmed, but on a different ground than the trial court. (*People v. Lopez* (Oct. 4, 2024, F085300) [nonpub. opn.].) Lopez's claim for relief, the court observed, rested on the contention that assertedly ambiguous instructions had permitted his jury to convict him of murder as an aider and abettor on a legally erroneous theory of imputed malice. The appellate court held that such a claim is not cognizable in a section 1172.6 petition since the claimed invalidity is not " 'because of' " the substantive " 'changes to Section 188 or 189 made effective January 1, 2019.' " (*Lopez*, at p. 21; § 1172.6, subd. (a)(3).) It reasoned that Lopez "could have advanced the same claim in his direct appeal from his 2007 conviction, and he has forfeited the claim by failing to raise it in his [prior] direct appeal." (*Lopez*, at p, 30.)

We granted review limited to the following question: "Does Penal Code section 1172.6, subdivision (a)(3), which requires defendants to allege that they 'could not presently be convicted of murder or attempted murder because of changes to section 188 or 189 made effective January 1, 2019,' render ineligible for relief petitioners who could have raised their challenges to imputed malice on prior direct appeal?" We conclude that Lopez is not categorically ineligible for relief and therefore reverse and remand to the Court of Appeal to address Lopez's appeal on the merits.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Prosecution case

On April 6, 2004, 24-year-old Norteño gang member Manuel Hernandez drove by a taco truck and saw three young men dressed in blue, a color traditionally associated with the Sureño gang:  Daniel Morales, Jesus Elizarraraz, and Gonzalo Villanueva.   Morales and Villanueva were Sureño gang members.  Elizarraraz testified that Hernandez, who was alone in the car and wearing a red sports jersey, stared at him "with a mean look" and yelled, "Fuckin' Scraps," a slur for Sureño gang members.   Hernandez then drove away while Elizarraraz remained with his friends.

Hernandez returned soon thereafter with several other men, including 16-year-old defendant Lopez, also affiliated with the Norteño gang.  Villanueva ran away and felt something hard hit him in the back of the head.  Two of the men in Hernandez's group chased after Villanueva, leaving Hernandez and Lopez. Elizarraraz testified that Hernandez then pulled out a gun, held it a few inches from Elizarraraz's face and said "[y]ou're not so tough now, are you?"  Elizarraraz did not see Lopez with a gun at any point during the encounter.  Elizarraraz testified that, after Hernandez threatened him with the gun, Lopez said "[a]re you ready for this" and began a fist fight with Morales.  As Hernandez walked towards the fist fight between Lopez and

---

[2]     The summary of facts is drawn from the Court of Appeal's opinion below.  We rely on these factual descriptions solely for the purpose of summarizing the background of this case.  They do not constitute factual findings for purposes of the present petition. (See *People v. Antonelli* (2025) 17 Cal.5th 719, 723, fn. 4 (*Antonelli*).)

Morales, Elizarraraz ran away, hearing gunshots just a "couple seconds" later.  Elizarraraz heard Hernandez say, "We got one of them, let's get out of here."  Elizarraraz then saw all four men run to the car.  Elizarraraz told police (during a positive, in-field identification of Hernandez) that Hernandez then put a gun under the seat.

Police officers arrested Hernandez in his car shortly after the shooting, less than two miles from the scene.  They discovered a bike chain with a padlock in his vehicle.  According to an officer, Hernandez's hands "were really wet and cold . . . like if you're rinsing your hands off and didn't dry them."  At a subsequent field show-up, Elizarraraz identified Hernandez as the person who pointed the gun at him.

Morales later died from his gunshot wounds.  The pathologist who performed Morales's autopsy recovered four .22-caliber bullets from his body.  Police searched Lopez's home multiple times, ultimately discovering a loaded .22-caliber revolver and ammunition from his bedroom.  A comparison of the bullets recovered from Morales's body and the seized unfired cartridges from the revolver from Lopez's bedroom was "inconclusive."

## B. Co-defendant Hernandez's Testimony

Hernandez testified in his own defense at trial.  While Hernandez was wearing a red sports jersey and a belt with an "N" on it during the confrontation, Hernandez denied he was an active Norteño gang member at the time of the shooting or that he had ill will toward Sureños "in a gang way."  He also denied using the slur "scraps" towards the victims.  Hernandez testified that on the day of the incident, he had a bicycle security chain with a lock on it "for protection."  He denied that he went to the

south side of Modesto to look for Sureños to attack. Hernandez testified that he wanted to fight the perceived Sureños gang members, so he drove away to find men to help him. Hernandez asserted that he then picked up three people without recognizing who they were because he "didn't really pay attention to what was in [his] back seat."

Hernandez denied carrying a gun the day of the incident and said he had never owned or handled a gun in his life. He also denied handling a gun at the scene and handing it to Lopez before the shooting. Hernandez admitted being present at the confrontation and that he struck Villanueva in the back of his head with the bike chain. Hernandez testified that when he heard a single gunshot he ran. When he looked back, he saw Lopez standing over Morales with his arm outstretched, holding something in his hand.

### C. Lopez's Defense

Lopez put on an alibi defense claiming that he and a friend, Reuben Moreno, had gone together to the tuxedo shop on the day of the murder and were there from approximately 2:30 p.m. to 6:00 p.m. Lopez also called an expert who agreed that the bullets taken from Morales's body could not be matched with the revolver seized from Lopez's bedroom. A latent print analyst examined the gun recovered from Lopez's room but did not find any fingerprints.

### D. Closing Argument, Instructions, and Verdict

At the preliminary hearing stage, the prosecution had adopted Elizarraraz's account, arguing that Hernandez was the shooter and Lopez was an aider and abettor by virtue of his fist-fighting with Morales. However, in closing argument at trial, the prosecution altered its theory. The prosecution argued that

Hernandez *originally* had the gun, but, after Elizarraraz fled, gave it to Lopez, who immediately thereafter shot Morales. Hernandez's counsel argued in closing that Hernandez had committed an assault, but that Lopez was the shooter and that Hernandez was completely unaware that Lopez was armed.

The jury was instructed on both perpetrator and accomplice liability theories. With respect to accomplice liability, the court instructed pursuant to former CALCRIM No. 400 that "[a] person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it." This instruction also stated that "[u]nder some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

With respect to aiding and abetting, the jury was instructed, in relevant part, pursuant to CALCRIM No. 401 as follows:

> To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> 1. The perpetrator committed the crime;
>
> 2. The defendant knew that the perpetrator intended to commit the crime;
>
> 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;
>
> AND

4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

And, under the instruction for murder, CALCRIM No. 520, the jury was instructed it had to find that the defendant committed an act that caused the death of another person and, when the defendant acted, he had a state of mind called malice aforethought. The jury was provided standard instructions on malice aforethought, including both express and implied malice.

The jury convicted both Lopez and Hernandez of assault with a deadly weapon and participating in a criminal street gang. The jury convicted Lopez of murder but hung on the murder count as to Hernandez.

### E. Section 1172.6 Proceedings and Subsequent Appeal

In 2019, Lopez filed a petition for resentencing under what is now section 1172.6, alleging that he had been convicted under a theory of imputed malice. The People conceded that Lopez had stated a prima facie case, a concession the trial court accepted. At the hearing, the People relied on the trial record and did not introduce additional evidence.

The trial court denied relief, concluding that "Lopez could be again tried under both theories that he was the actual killer based on the testimony at trial or that he was a direct aider and abettor who shared the intent to kill based on the evidence

exhibited before, during, and after the incident itself." At the prosecutor's urging, the trial court corrected itself to indicate that it should have stated "would" instead of "could." Further elaborating, the trial court stated, "[i]t's not me interjecting what I feel about the facts of the case other than he could be/would be prosecuted under either theory." It subsequently noted that it had been "inartful" in saying the standard was that petitioner " 'would be tried again' as opposed to convicted based on either theory." Although defense counsel argued that the trial court was required to pick between the two conflicting theories of liability and state the facts that would support whichever theory it found, the trial court repeatedly declined to do so.

Lopez appealed, arguing that there was insufficient evidence to support the court's finding and that the court had erred in adopting two factually inconsistent theories. The state did not contest Lopez's eligibility for an evidentiary hearing and defended the trial court's ruling on the merits. However, the Court of Appeal subsequently asked the parties to submit supplemental briefing on whether Lopez was ineligible for relief as a matter of law. The People then, for the first time, argued that Lopez was categorically ineligible for relief. Accepting this argument, the appellate court ruled, based upon a trio of Court of Appeal cases, *People v. Burns* (2023) 95 Cal.App.5th 862 (*Burns*), *People v. Flores* (2023) 96 Cal.App.5th 1164 (*Flores*), and *People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921 (*Berry-Vierwinden*), that Lopez was barred from seeking resentencing relief because he had not raised on direct appeal from his conviction the instructional ambiguity which was the basis of his section 1172.6 petition. We granted review.

### F. Prior Conflicting Decisions in the Courts of Appeal

Understanding the procedural bar applied by the court below requires discussion of the Court of Appeal cases on which it relied, *Burns*, *Flores*, and *Berry-Vierwinden,* as well as two conflicting cases which preceded them, *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*) and *People v. Maldonado* (2023) 87 Cal.App.5th 1257 (*Maldonado*)

#### 1. *Langi* and *Maldonado*

In *Langi*, *supra*, 73 Cal.App.5th 972, the Court of Appeal addressed a section 1172.6 petition in which, in the underlying trial, the defendant and three others had robbed a group that included the victim, Martinez. Martinez died after someone in Langi's group punched him, causing Martinez to fall and hit his head, leading to his death. (*Langi,* at p. 975.) Similar to the former CALCRIM No. 400 instruction given in this case, the jury in *Langi* was provided with an analogous CALJIC instruction, CALJIC No. 3.00, setting forth that each principal in a crime, "regardless of the extent or manner of participation[,] is equally guilty." (*Langi,* at p. 981, fn. 8.) The jury was also instructed using standard second degree murder and aiding and abetting instructions, CALJIC Nos. 8.31 and 3.01. Under CALJIC No. 3.01, aiding and abetting was defined as follows: "A person aids and abets the commission . . . of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, . . . [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime." (*Ibid*.)

Under the facts of that case, the Court of Appeal found that *Langi* was not categorically ineligible for relief under section 1172.6. The *Langi* court first reasoned, as previously noted by the Court of Appeal in *People v. Powell* (2021) 63 Cal.App.5th 689, 712–714 (*Powell*), a direct appeal case, that the standard aiding-and-abetting instructions "are ill suited to the crime of second degree murder." (*Langi, supra,* 73 Cal.App.5th at p. 982.) *Langi* concluded: "If, as here, a trial court uses such an instruction without tailoring it to the specifics of that crime, the instruction creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Ibid.*) The *Powell* court, upon which *Langi* relied, had determined that, when standard aiding and abetting instructions are conjoined with second degree murder instructions, and are not tailored to the facts of a specific case, a jury must find "the perpetrator intended to commit *the crime*, the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*." (*Powell*, at p. 714, original italics.) However, the *Powell* court concluded that this creates a potential ambiguity because the actus reus and mens rea requirements for aiding and abetting a second degree murder do not turn on aiding in an underlying *crime* but aiding in the commission of the life-endangering *act*. (*Ibid.*; see also *People v. Reyes* (2023) 14 Cal.5th 981, 990–992 (*Reyes*) [approving of the reasoning of

*Powell* that, for aiding and abetting murder liability, " '[t]he relevant act is the act that proximately causes death' "].)[3]

Thus relying on *Powell*, the *Langi* court reasoned that CALJIC No. 3.01 required the defendant to act " '*with knowledge of the unlawful purpose of the perpetrator*, and . . . with the intent or purpose of committing or encouraging or facilitating the commission of *the crime*.' " (*Langi, supra,* 73 Cal.App.5th at p. 982, citing CALJIC No. 3.01, first italics in original.) Based on these instructions and the evidence in that case, the *Langi* court concluded that "the jury was entitled to conclude that, to be guilty as an aider and abettor of second degree murder, appellant need only have intended to encourage the perpetrator's intentional act — in this case, punching Martinez — whether or not appellant intended to aid or encourage Martinez's killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Id.* at p. 983.) Because the appellate court concluded that "the record of conviction does not conclusively negate the possibility that the jury found appellant guilty of second degree murder by imputing to him the implied malice of the actual killer," Langi was entitled to an evidentiary hearing. (*Id.* at p. 984.)

*Langi* was followed by *Maldonado, supra*, 87 Cal.App.5th 1257. Maldonado was convicted at trial of first degree murder and the jury was not presented with theories of natural and probable consequences or felony murder. (*Id.* at p. 1259.) Maldonado nonetheless sought resentencing under section

---

[3]     The Court of Appeal in *Powell* thus found the provision of non-tailored aiding and abetting instructions for second degree murder erroneous under the facts of that case, but concluded the error was harmless. (*Powell, supra*, 63 Cal.App.5th at p. 714.)

1172.6, arguing that he had established a prima facie case of eligibility based on "the jury instructions for aiding and abetting, implied malice, and lying-in-wait murder, and on the analysis in *People v. Langi*." (*Maldonado*, at p. 1259.) The Court of Appeal in *Maldonado* concluded that an ambiguity existed as the result of these instructions, similar to the ambiguity that the *Langi* and *Powell* opinions had perceived. (*Maldonado,* at pp. 1264–1267.) Based on the alleged ambiguity in the "unlawful purpose" and "crime" language of CALCRIM No. 401, and the lack of an intent to kill requirement in the lying-in-wait murder instruction, CALCRIM No. 521, the *Maldonado* court reasoned that the aiding and abetting instructions left open the possibility that "the jury may have found the perpetrator's *purpose* was only to injure or intimidate the victim in a surprise attack." (*Maldonado,* at p. 1266, original italics.) Thus, the defendant, under the aiding and abetting instructions, may have intended only to encourage the perpetrators' intentional act — a surprise attack on the victim — and not the act of the victim's killing. (*Ibid.*) The Court of Appeal therefore remanded for an evidentiary hearing. (*Id.* at p. 1269.)

As noted above, our decision in *Reyes* underscored that it is the fatal *act,* not any underlying crime, that an aider and abettor of second degree murder must aid or abet. (*Reyes*, *supra*, 14 Cal.5th at p. 991.) We thus ultimately concluded that it was error to "rely[] exclusively on the legal principles outlined in CALCRIM No. 520" to deny relief. (*Ibid.*) In September 2023, citing our decision in *Reyes*, the Judicial Council adopted a new jury instruction setting forth the elements of aiding and abetting implied malice murder. (See CALCRIM No. 526.) The instruction addresses the potential ambiguity identified by the

13

*Powell* court and clarifies that an aider and abettor to implied malice murder must personally harbor implied malice and must aid the perpetrator's fatal act.[4]  This instruction, however, was not given at Lopez's trial.

### 2. *Burns*, *Flores,* and *Berry-Vierwinden*

The Court of Appeal in *Burns, supra,* 95 Cal.App.5th 862, adopted a different approach.  In *Burns*, the petitioner, whose jury had received the then standard aiding and abetting instructions at the original trial, including the "equally guilty" language from the now-disapproved version of CALCRIM No.

---

[4]     CALCRIM No. 526 provides, in relevant part:  "To prove that the defendant is guilty of aiding and abetting murder by acting with implied malice, the People must prove that:  [¶] 1. The perpetrator committed [an] act[s] that (was/were) dangerous to human life; [¶] 2. The perpetrator's act[s] caused the death of (another person/[or] a fetus); [¶] 3. The defendant knew that the perpetrator intended to commit the act[s] that (was/were) dangerous to human life; [¶] 4. Before or during the commission of the perpetrator's act[s], the defendant intended to aid and abet the perpetrator in committing the act[s] that (was/were) dangerous to human life; [¶] 5. Before or during the commission of the perpetrator's act[s], the defendant knew the perpetrator's act[s] (was/were) dangerous to human life, and the defendant deliberately acted with conscious disregard for human life; [¶] AND [¶] 6. By words or conduct, the defendant did in fact aid and abet the perpetrator's commission of the act[s]. . . . [¶]   If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.  [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.  [¶]  An act is *dangerous to human life* if there is a high degree of probability that the act will result in death"

400, argued that these instructions allowed the jury to convict him as an aider and abettor on a theory of imputed malice. (*Burns*, at pp. 865–866.)  The Court of Appeal found that even if the instructions were flawed, he was still ineligible for resentencing relief due to the language of section 1172.6, subdivision (a)(3), which requires petitioners to establish that they " 'could not presently be convicted of murder or attempted murder *because of changes to Section 188 or 189 made effective January 1, 2019.' "  (*Burns*, at p. 867 [quoting § 1172.6, subd. (a)(3)], original italics.)   In its reading, "the alleged error he identifies has nothing to do with the 2018 and 2021 legislative changes that gave rise to section 1172.6's petition process."  (*Id.* at p. 865.)  The court reasoned, for instance, that the "problem with the 'equally guilty' language in former version CALCRIM No. 400 was not that it permitted the jury to rely on a *now*-invalid theory of criminal liability, but that it may have misled the jury as to what was *then* required to convict Burns."  (*Burns,* at p. 868, italics in original.)  Analogizing to our long-established *Dixon*[5] procedural bar for habeas corpus petitions, the Court of Appeal held that section 1172.6, subdivision (a)(3) meant that a petitioner's "failure to raise the argument on direct appeal forfeited th[e] claim" that ambiguous instructions allowed them to be convicted based on an unlawful theory of imputed malice. (*Burns,* at p. 868.)

In *Flores*, the petitioner seeking resentencing argued that the jury instructions given at his 2010 trial permitted the jury

---

[5]    *In re Dixon* (1953) 41 Cal.2d 756, 759 (writ of habeas corpus "will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction").

to convict him of provocative act murder based on an imputed malice theory — that he aided and abetted his accomplice's provocative act without himself harboring malice. (*Flores*, *supra*, 96 Cal.App.5th at p. 1170.) The Court of Appeal concluded that the law at the time of Flores's conviction in 2010 already required aider and abettors of provocative act murder to possess malice. (*Id*. at pp. 1173–1174 & fn. 4.) Because Flores's claim that he could have been convicted on an imputed malice theory was thus "a routine claim of instructional error" that "could have been asserted on appeal from the judgment of conviction," the Court of Appeal found he was ineligible for relief. (*Id*. at p. 1173.)

*Burns* and *Flores* were followed by *Berry-Vierwinden*, *supra*, 97 Cal.App.5th 921, another appeal from the denial of a section 1172.6 petition that addressed the same aiding and abetting and lying-in-wait murder instructions as *Maldonado* and *Langi*. The *Berry-Vierwinden* court followed *Burns* and *Flores* disagreeing with *Maldonado* and *Langi* to the extent that they had allowed an "instructional error [to] be asserted as a basis for section 1172.6 relief — even if the alleged error could have been raised on direct appeal under then-existing law." (*Berry-Vierwinden*, at p. 936.) As in *Burns* and *Flores*, the *Berry-Vierwinden* court held that " '[s]ection 1172.6 does not create a right to a second appeal, and [Berry-Vierwinden] cannot use it to resurrect a claim that should have been raised in his [direct] appeal.' " (*Ibid*.)

## II. DISCUSSION

### A. Principles of Statutory Interpretation

As we have articulated in other cases interpreting section 1172.6, "[t]he proper interpretation of a statute is a question of

law we review de novo. [Citations.] ' " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' [Citation.] ' "[W]e look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " ' " (*People v. Lewis* (2021) 11 Cal.5th 952, 961 (*Lewis*); accord, *People v. Curiel* (2023) 15 Cal.5th 433, 461 (*Curiel*). As this court and others have recognized, section 1172.6's resentencing scheme constitutes remedial legislation (*People v. Delgadillo* (2022) 14 Cal.5th 216, 221; *People v. Bucio* (2020) 48 Cal.App.5th 300, 314), and such legislation "must be liberally construed in a manner that serves its remedial purposes." (*Frlekin v. Apple Inc.* (2020) 8 Cal.5th 1038, 1045; *Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 233.)

### B. Legal Standards for Assessing the Prima Facie Case Under Section 1172.6

The section 1172.6 petition process "begins with the filing of a petition containing a declaration that all requirements for eligibility are met ([§ 1172.6], subd. (b)(1)(A)), including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] Section 188 or 189 . . .' " (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) To determine whether a prima facie case has been

17

pled, courts must take a "petitioner's factual allegations as true and make[] a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." (*Lewis*, *supra*, 11 Cal.5th at p. 971.) In making this determination, courts may examine portions of the record of conviction but may neither engage in " 'factfinding involving the weighing of evidence or the exercise of discretion' " nor make "credibility determinations." (*Lewis*, at p. 974.) At this preliminary stage, denial of a section 1172.6 petition is proper only "[i]f the petition and record in the case establish conclusively that the defendant is ineligible for relief." (*Strong*, at p. 708, accord, *Curiel, supra,* 15 Cal.5th at p. 461; *Antonelli*, *supra*, 17 Cal.5th at p. 724.)

### C. Analysis

The Attorney General concedes that the Court of Appeal "erred in imposing a categorical bar to relief and should instead have considered Lopez's record of conviction holistically before denying relief." As he explains, "[t]he mere fact that a petitioner could have raised an analogous pre-S[enate] B[ill] 1437 claim of instructional error at trial or in his original appeal does not render him categorically ineligible for relief under section 1172.6, nor does the failure to previously make such a claim forfeit the possibility of relief under the statute." The Sacramento County District Attorney, appearing as amicus curiae, urges us to uphold the decision of the court below and approve the prior appellate decisions upon which it is based. We agree with the Attorney General and disapprove the *Burns-Flores-Berry-Vierwinden* line of cases and their importation of a

*Dixon*-like procedural bar in this context.[6] These cases interpret section 1172.6, subdivision (a)(3) in a manner that conflicts with the statute's text and fundamental purpose. Further, the procedural bar these decisions read into section 1172.6 aligns with neither the doctrine of issue preclusion that informs analysis of prima facie ineligibility nor the purposes that the *Dixon* bar serves in the habeas corpus context. Therefore, we reverse and remand the matter to enable the Court of Appeal to address in the first instance the merits of Lopez's claim that the jury instructions allowed him to be convicted on a now-invalid theory and any other claims regarding the propriety of the trial court's ruling denying his petition.

>    1. The text and purpose of section 1172.6 do not
>       support the imposition of the procedural bar
>       applied in this case

The court below determined that Lopez was categorically ineligible for prima facie relief due to his failure to satisfy the requirement that his murder conviction was "because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) As the appropriate and necessary starting point, we therefore begin with the relevant text of section 1172.6, subdivision (a)(3) itself. (*Lewis*, *supra*, 11 Cal.5th at p. 961.)

On its face, this subdivision makes no mention of prior appeals or explicit reference to any form of procedural bar. As a

---

[6]    We also disapprove of *People v. Krueger* (2025) 115 Cal.App.5th 431, *People v. Warner* (2025) 115 Cal.App.5th 416, and *People v. Superior Court* (*White*) (2025) 107 Cal.App.5th 1268, to the extent they are inconsistent with this opinion.

general matter, section 1172.6, subdivision (a) simply lays out the components necessary to establish a prima facie case of relief, including section 1172.6, subdivision (a)(3)'s requirement that the "petitioner could not *presently* be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3), italics added.) The textual focus of subdivision (a)(3) is not an inquiry into which appellate issues might have been raised in the past challenging particular jury instructions. Nor is it an inquiry into which issues could have been raised in a prior direct appeal as a result of prosecution arguments which may have allowed the jury to consider an impermissible theory of imputed malice.

An interpretation of section 1172.6, focusing on the petitioner's guilt under current law, is the approach we took in *Curiel, supra*, 15 Cal.5th 433. In *Curiel*, the jury in the original trial had been instructed on aiding and abetting under the now-invalid natural and probable consequences doctrine. (*Id.* at p. 446.) The prior jury, through its finding of the gang special circumstance, had also found the defendant possessed an intent to kill, a finding to which we afforded preclusive effect. (*Id.* at p. 453.) The Attorney General argued that this intent to kill finding was "not only relevant, but dispositive, based on section 1172.6, subdivision (a)(3)." (*Id.* at p. 460.) We ultimately rejected this argument, however, explaining "a petitioner who alleges that he or she could not currently be convicted of a homicide offense 'because of changes to Section 188 or 189 made effective January 1, 2019' (§ 1172.6, subd. (a)(3)) puts at issue all elements of the offense under a valid theory." (*Id.* at p. 462.) We reasoned that an allegation under section 1172.6, subdivision (a)(3) is not "refuted by the record unless the record

conclusively establishes every element of the offense" and that "[i]f only *one* element of the offense is established by the record, the petitioner could still be correct that he or she could not *currently be convicted* of the relevant offense based on the absence of *other* elements." (*Curiel,* at p. 463, second italics added.) Other appellate decisions are in accord. (See, e.g., *People v. Clements* (2022) 75 Cal.App.5th 276, 296 [section 1172.6, subdivision (a)(3) requires that, when filing a petition, the defendant must allege "*what would happen today* if he or she were tried under the new provisions of the Penal Code"], italics added; *People v. Lee* (2023) 95 Cal.App.5th 1164, 1185 ["The question presented by section 1172.6, subdivision (a)(3) is whether, had the amendments to Penal Code sections 188 and 189 existed *at the time of the defendant's conviction*, the defendant could have been convicted of murder or attempted murder"].)

Despite the statute's focus on whether a defendant would be convicted under current law, the appellate courts in *Burns, Flores*, and *Berry-Vierwinden*, assumed, at least *arguendo*, that the petitioners before them may have been convicted under now-invalid theories of imputed malice. (See, e.g., *Berry-Vierwinden, supra,* 97 Cal.App.5th at p. 933; *Burns, supra*, 95 Cal.App.5th at p. 865.) The logic of these cases would bar resentencing for defendants who clearly were convicted under a theory of imputed malice whenever the claim relied even in part on instructions not challenged in a prior appeal.

Rejecting eligibility at the prima facie stage based on the failure to challenge ambiguous instructions in prior appeals predating Senate Bill 1437 for those otherwise eligible is not a convincing interpretation of section 1172.6, subdivision (a)(3). The statute specifically describes the narrow relevance of prior

appeals for purposes of the evidentiary hearing. (See § 1172.6, subd. (d)(3) [resentencing courts may "consider the procedural history of the case recited in any prior appellate opinion"].) In articulating the requirements for the prima facie case, section 1172.6, subdivision (a) makes no reference to any procedural bar based on the arguments raised (or not raised) on direct appeal, or indeed any reference to the prior appeal at all. (Cf. *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [" 'It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' "].) If the Legislature had intended to erect a procedural bar based on failure to raise claims in a prior appeal, it likely would have done so more directly.

More importantly, the construction of the statute adopted by the court below contradicts the express intent of Senate Bill 1437. The legislation was designed to offer resentencing to those convicted under now-invalid theories of imputed malice. "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) The purpose of this bill was "to more equitably sentence offenders" involved in homicides. (Stats. 2018, ch. 1015, § 1, subd. (b).) As the codified legislative findings detail, Senate Bill 1437 was enacted "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) With the exception of section 189, subdivision (e), "a conviction for murder requires that a person act *with malice aforethought*" and that

"[a] person's culpability for murder must be premised upon that person's *own actions and subjective mens rea.*" (Stats. 2018, ch. 1015, § 1, subd. (g), italics added.) Senate Bill 775 subsequently clarified that Senate Bill 1437's ameliorative scheme was intended to reach not merely felony murder or natural and probable consequences cases. Instead, the statute reaches any murder conviction in which a defendant may have been convicted based on a "theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a)(1).)

In other words, the primary and overarching purpose of Senate Bill 1437's scheme is to identify and to afford resentencing relief, in qualifying cases, to those who may have been convicted under imputed-malice murder theories. (*Lewis*, *supra*, 11 Cal.5th at p. 971 [purpose of Senate Bill 1437 was to "ensure that murder culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process"].) To fulfill the statute's functions, the " 'prima facie bar was intentionally and correctly set very low.' " (*Lewis*, at p. 972.) The court below did not reject Lopez's argument that, based upon the jury instructions, he may have been convicted based upon diminished culpability, yet denies him eligibility for relief by asserting that the claim is simply "not cognizable" due to his failure to raise the issue in his prior direct appeal. Such denial conflicts with the express goals of Senate Bill 1437.

The legislative history does not support the reading of the lower court, either. Like the text of the statute itself, the legislative history of Senate Bill 1437 demonstrates a focus on the invalidity of petitioners' convictions under *current law*. Both

Assembly and Senate analyses of Senate Bill 1437 indicated that the third requirement of prima facie eligibility was simply that "[t]he person could not be convicted of 1st or 2nd degree murder under the provisions of this bill." (3d reading analysis of Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as amended Aug. 20, 2018, pp. 1–2; see also Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1437 (2017–2018 Reg. Sess.) as amended Aug. 20, 2018, p. 4.)

The court below, and the Courts of Appeal in *Burns*, *Flores*, and *Berry-Vierwinden*, purported to find textual support for their interpretation in the "because of" language of section 1172.6, subdivision (a)(3). More granularly, these opinions reasoned that our decision in *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*) established that "the direct perpetrator's mental state could *not* be imputed to an aider and abettor, whose mental state had to be independently evaluated." (*Burns*, *supra*, 95 Cal.App.5th at p. 868; original italics, see also *Berry-Vierwinden*, *supra*, 97 Cal.App.5th at p. 935 ["After the Supreme Court's 2001 decision in *McCoy*, it was unmistakable that a direct aider and abettor's 'mental state is her own; she is liable for her mens rea, not the other person's.' "], accord, *Flores*, *supra*, 96 Cal.App.5th at p. 1173.) Thus, because *McCoy* was decided prior to the defendants' respective trials, these appellate courts reasoned the invalidity of the defendants' alleged imputed malice murder convictions could not have been "because of" the changes created by Senate Bill 1437. Instead, the appellate courts concluded that petitioners' convictions were due to instructional errors that they could and should have raised in their prior direct appeals. (*Burns, supra*, 95 Cal.App.5th at pp. 868–869; *Flores, supra*, 96 Cal.App.5th at p. 1173; *Berry-Vierwinden, supra*, 97 Cal.App.5th at p. 936; *Lopez*,

*supra*, F085300.) As the court below concluded, "it was *McCoy* that created the basis for the jury instruction issue; S[enate] B[ill] 1437 did not create the issue."

This analysis is flawed in several respects. First, the reasoning fails even on its own terms. *McCoy* was not the basis of Lopez's theory of imputed malice and Lopez's claim for relief did not invoke *McCoy* to establish a prima facie case. Instead, Lopez relies, properly, on the instructions given in his trial and the Court of Appeal decisions interpreting them. (See *Antonelli*, *supra*, 17 Cal.5th at p. 731 [in assessing prima facie eligibility for section 1172.6 petitions from individuals convicted following jury trials, "the jury instructions will be critical."].) *McCoy*, although providing important additional clarity to the respective mental states of perpetrators and aiders and abettors, did not discuss the relevant jury instructions at issue here, much less address or recognize ambiguity in any particular instruction.

When Lopez was asked for the first time, through the Court of Appeal's request for supplemental briefing, to more fully articulate his theory of imputed murder liability (which had been conceded by the People in the trial court), he did not cite *McCoy*. Instead, Lopez relied on *Powell*, *Langi*, and *Maldonado*, decisions that affirmatively identified potential ambiguities in the aiding and abetting and murder instructions similar or identical to those considered by his jury — all of which postdated his 2007 trial by more than a decade. Surely the Legislature did not mean to foreclose relief to defendants merely because prior appellate counsel did not foresee that future case law might support a claim of instructional error that could have demonstrated imputed malice.

Second and relatedly, *McCoy* is not capable of supporting the doctrinal weight attributed to it by *Burns*, *Flores*, *Berry-Vierwinden*, and the decision below. As we recently explained in *Antonelli*, "while *McCoy* . . . represent[ed] [an] important building block[] in the evolution of our decisional law" it did not represent a definitive statement foreclosing juries from ever imputing malice to an accomplice. (*Antonelli, supra*, 17 Cal.5th at p. 729.) It may be that Lopez could have challenged the instructions at his trial by relying on the principles of *McCoy*. However, it would be inaccurate to say, as the Court of Appeal did below, that *McCoy* was the sole "basis for the jury instruction issue."

Finally, even assuming that *McCoy* or other decisions existing at the time of Lopez's appeal could have supplied a *partial* basis for the theory of imputed malice asserted by Lopez, this would not categorically bar relief. Our analysis in *Strong, supra*, 13 Cal.5th 698 indicates that the "because of" language of section 1172.6, subdivision (a)(3) requires merely that the changes in murder liability arising from Senate Bill 1437 be *a basis* for the claim, not that they be the *sole* basis. (*Strong*, at p. 712.)

In *Strong*, we considered whether a defendant convicted under a theory of felony murder was ineligible for resentencing relief under section 1172.6 because the jury that had convicted him of felony murder "also found true felony-murder special-circumstance allegations that he was a 'major participant' who acted 'with reckless indifference to human life.' " (*Strong, supra*, 13 Cal.5th at p. 703.) We concluded that the jury's felony-murder special-circumstances findings, made prior to our decisions in *People v. Banks* (2015) 61 Cal.4th 788, and *People v. Clark* (2016) 63 Cal.4th 522, did not render the defendant in

that case categorically ineligible for relief. (*Strong*, at p. 703.) We rejected, in particular, the argument that section 1172.6, subdivision (a)(3)'s "because of" language foreclosed relief. (*Strong*, at p. 712.) We reasoned that a pre-*Banks/Clark* defendant's claim for resentencing "depends, in a 'but for' sense, on *Banks* and *Clark*; if those decisions had not clarified the law regarding the relevant elements, the defendant would have no argument for relief under Senate Bill 1437." (*Ibid.*) But we explained that the changes wrought by those decisions "matter for resentencing purposes only because the Legislature chose to write the same elements into its revised definition of murder." (*Ibid.*) We concluded that "section 1172.6, subdivision (a)(3)'s 'because of' language does not require a showing that a claim to relief under Senate Bill 1437 arises from *no other* cause — only that the 2019 changes supply a basis for the claim and so are *a* cause." (*Ibid.*, original italics.)

This reasoning aligns with past decisions construing the phrase "because of." As we have explained that phrase " 'connotes a causal link' " of some kind (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 757), but the kind of link that is intended varies depending on the context. (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 216 ["Our precedent has recognized . . . that 'but for' causation is not the only possible meaning of the phrase 'because of' in the context of an antidiscrimination statute"], 217 [acknowledging "that there are at least three plausible meanings of the phrase 'because of' in [Government Code] section 12940(a)"].) In some circumstances "because of" can describe a causal connection in which the "cause" is not strictly necessary, in a but-for sense, for a consequence to occur. (See *In re M.S.* (1995) 10 Cal.4th 698, 732 (conc. opn. of Kennard, J.)

[explaining that "because of" in § 422.6 and former § 422.7 was more expansive than strict "but for" causation].)

So too here. In requiring petitioners seeking resentencing under section 1172.6 to allege that they "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019" (§ 1172.6, subd. (a)(3)), the Legislature did not therefore intend a causal connection that is satisfied *only* when the changes effected by Senate Bill No. 1437 represent a "but for" reason why a petitioner is eligible for resentencing. (See *Strong*, supra, 13 Cal.5th at pp. 711–712.) Thus, even though the "building block" of our decision in *McCoy* may have laid the groundwork for some component of Lopez's section 1172.6 petition, it is, at most, a partial cause for his claim for relief. Ultimately, Lopez's claim that he "could not presently be convicted of murder or attempted murder *because of changes to Section 188 or 189* made effective January 1, 2019" (§ 1172.6, subd. (a)(3), italics added) rests on the Legislature's change to section 188, namely that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); cf. *Curiel*, *supra*, 15 Cal.5th at p. 462 [narrow reading of the "because of" language "ignores the provision's broader effect on murder liability in California"].)

Further, ascertaining whether an issue of instructional ambiguity could and should have been raised on prior direct appeal raises practical difficulties. As a general matter, such a retrospective inquiry into appellate defense counsel's strategic decisions is susceptible to "the distorting effects of hindsight." (*In re Valdez* (2010) 49 Cal.4th 715, 729.) Although sometimes a claim with merit is clear from existing authority, it is more frequently murky. We doubt the Legislature intended trial

courts to resolve such nebulous legal questions at the prima facie stage.

If, as Lopez alleges, the record of conviction, including the jury's findings as informed by the instructions, evidence, and argument in his case did not "conclusively refute [his] allegation that he . . . could not be convicted of murder under current law[,]" dismissal at the prima facie stage is improper. (*Curiel*, *supra*, 15 Cal.5th at p. 463.) Ignoring the actual instructions provided to the petitioner's trial jury — as the decision below does — contradicts our recent direction that these instructions play a central role in ascertaining the meaning of jury factfinding in assessing prima facie eligibility. (*Antonelli*, *supra*, 17 Cal.5th at p. 731.) In other words, as the Attorney General asserts, a claim made pursuant to section 1172.6 based on instructional ambiguity does not become noncognizable simply because the court and parties may "use tools also used to assess claims of instructional error, or because a petitioner may also have had a viable claim of instructional error at trial or on appeal."

Amicus curiae proposes a distinct textual basis to support the holding of the court below. It admits that the language of section 1172.6 is "silent on the concept of forfeiture." It points instead to the language added by Senate Bill 775, which clarified that "a person convicted of felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime* . . . may file a petition" for resentencing. (§ 1172.6, subd. (a), italics added.) Amicus curiae notes that the italicized language was included after several appellate decisions had held that provocative murder was neither felony murder nor murder under the natural and

probable consequences doctrine, and therefore the petitioners convicted of provocative act murder were deemed ineligible for relief. Amicus curiae infers that the term "other theory under which malice is imputed" must have been intended to encompass only *judicially recognized* theories of imputed malice, such as felony murder, the natural and probable consequences doctrine, or provocative act murder, that were "abrogated or narrowed" by Senate Bill 1437. Thus, amicus curiae argues, because Lopez's jury was never instructed on a judicial theory "abrogated" by Senate Bill 1437 or Senate Bill 775, he is categorically ineligible for relief.

Amicus curiae's narrow reading of "other theory under which malice is imputed" is unpersuasive. Amicus curiae is correct that the Legislature may have been, and is presumed to be, aware of existing appellate authority (*Estate of McDill* (1975) 14 Cal.3d 831, 839), including cases prior to the passage of Senate Bill 775 rejecting provocative act murder as a basis for section 1172.6 relief. However, to the extent amicus curiae argues that the phrase "other theory" was therefore intended to refer *solely* to forms of provocative act murder in which malice may be imputed, that is not the language adopted by the Legislature. Instead of specifically referencing this particular theory, as it had for felony murder and the natural and probable consequences doctrine in Senate Bill 1437, the Legislature adopted broader language. It would be odd to construe this distinctively general phrasing to encompass only the single additional theory cited by amicus curiae.

Moreover, the legislative history describes the addition of "other theory under which malice is imputed" as applying broadly to "a theory" under which malice was imputed. (See, e.g., Sen. Rules Com. Off. of Sen. Floor Analyses, 3d reading

analysis of Sen. Bill 775 (2021–2022 Reg. Sess.) as amended Sept. 1, 2021, pp. 1, 4; Assem. Com. on Appropriations, Analysis of Sen. Bill 775 (2021–2022 Reg. Sess.) as amended July 6, 2021, p. 1; Assem. Com. on Public Safety, Analysis of Sen. Bill No. 775 (2021–2022 Reg. Sess.) as amended July 6, 2021, p. 1.) Indeed, the Assembly Committee on Public Safety analysis went on to describe the language cited by amicus curiae as "a catchall provision." (*Id.* at p. 7.) The repeated use of the expansive phrase "any theory" and explicit reference to the added text as a "catchall" within Senate Bill 775's legislative history support a broad reading of the language. (See *In re M.M.* (2012) 54 Cal.4th 530, 538 ["use of the catchall phrase 'any public officer' signaled [Legislature's] intent to give the codified section an even broader application"].)

The phrase "other theory under which malice is imputed" could, and we believe does, also refer to any theory of criminal liability that could lead to conviction based on imputed malice, as defined by argument, evidence, and instructions. In the context of section 1172.6, we have already suggested that it is instructional theories of *guilt*, not simply named and judicially recognized theories, that establish eligibility. As we explained in *Antonelli*, the reasons that instructions are "critical" in the eligibility inquiry is that they help explain "whether defendant was *convicted 'pursuant to a "theory* under which malice is imputed to a person based solely on that person's participation in a crime." ' " (*Antonelli*, *supra*, 17 Cal.5th at pp. 731–732, italics added, internal quotation marks omitted.) And, in *People v. Patton* (2025) 17 Cal.5th 549 (*Patton*), we described our past cases under section 1172.6 as assessing whether "an invalid theory was supported by the evidence" and "argued by the parties." (*Patton*, at p. 566, fn. 8.)

Under the interpretation offered by amicus curiae, even if instructions clearly allowed malice to be imputed from the perpetrator to the accomplice, or if the prosecutor argued that the instructions allowed for such imputation of malice, section 1172.6 petitioners would still be ineligible based on the failure to raise the issue in a prior appeal. Thus, like the Court of Appeal's construction of section 1172.6, subdivision (a)(3)'s "because of" language, amicus curiae's interpretation of "other theory under which malice is imputed" also runs counter to the express purpose of section 1172.6.

As we have underscored, the language of section 1172.6 is to be interpreted " ' "in context, keeping in mind the nature and obvious purpose of the statute." ' " (*Lewis*, *supra*, 11 Cal.5th at p. 961.) The central ameliorative purpose of section 1172.6 was to "ensure that murder culpability is commensurate with a person's actions." (*Lewis,* at p. 971.) Amicus curiae identifies no reason to conclude that defendants to whom malice was imputed via a judicially recognized theory are any less culpable than defendants to whom malice may have been imputed via instructions that are ambiguous, whether that ambiguity is plainly apparent on the face of the instructions or revealed only by flawed argument. (See *People v. Beltran* (2013) 56 Cal.4th 935, 954–955.) Given the availability of another reasonable interpretation, construing the phrase "other theory under which malice is imputed" narrowly — as a categorical bar to eligibility for defendants such as Lopez, who allege a prima facie case based on instructional ambiguity — runs counter to legislative intent. We therefore reject amicus curiae's construction. (See *Allen v. Sully–Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [we must "choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to

promoting rather than defeating the general purpose of the statute"].)

### 2. Principles of issue preclusion do not categorically bar Lopez's claim

We have indicated that general principles of issue preclusion inform consideration of the effect of prior jury findings in a resentencing proceeding under section 1172.6. (*Curiel*, *supra*, 15 Cal.5th at p. 451; *Strong*, *supra*, 13 Cal.5th at pp. 715–716.) As traditionally understood and applied, issue preclusion "bars relitigation of issues earlier decided 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' [Citation.]" (*Strong*, at p. 716.) In deciding the question of whether an issue was "actually litigated" in the prior proceedings, " 'courts look carefully at the *entire record* from the prior proceeding, including the pleadings, *the evidence*, *the jury instructions*, and any special jury findings or verdicts.' [Citation.]" (*Curiel*, at p. 452, italics added.) Issue preclusion, however, does not apply to "issues that could have been raised and decided in the prior proceeding but were not." (*Bridgeford v. Pacific Health Corp.* (2012) 202 Cal.App.4th 1034, 1043.)

Amicus curiae effectively argues that courts should afford preclusive effect to jury findings by looking to what facts the jury was *supposed* to have found under abstract legal principles. Instead, courts should apply preclusive effect only to findings on

factual issues *necessarily* found, looking to the entire record (i.e., the jury instructions provided, applied to the evidence presented, leading to particular jury findings). (*Curiel*, *supra*, 15 Cal.5th at p. 452.)

To be sure, the Legislature did not "open resentencing to every previously convicted murder defendant" and we have rejected "wholesale relitigation of findings supporting murder convictions in the context of section 1172.6 resentencing." (*Strong*, *supra*, 13 Cal.5th at p. 715.) To the contrary, jury findings which, on their face, supply the elements to a still-valid theory of murder "ordinarily do foreclose section 1172.6 resentencing." (*Ibid*.) However, this does *not* mean that potentially ambiguous or even openly flawed instructions should be ignored by a resentencing court evaluating a petitioner's prima facie allegations merely because these flaws were not raised in a prior appeal. Instead, in cases such as Lopez's, the section 1172.6 resentencing court should address on the merits the alleged flaws or ambiguities in instructions that may have resulted in conviction under now-invalid theories of imputed of malice.

### 3. The analogy to the habeas corpus context adopted by the decision below is inapt

The Court of Appeal in *Burns* drew support for its section 1172.6 forfeiture rule by direct analogy to the procedural bar in *Dixon*, *supra,* 41 Cal.2d at p. 759. (*Burns*, *supra*, 95 Cal.App.5th at p. 868.) As set forth in *Dixon*, the "general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." (*Dixon*, at p. 759.)

The fundamental question in this case is whether section 1172.6 should be interpreted to also encompass a procedural bar, similar in function to *Dixon*, barring relief based on theories of flawed or ambiguous instructions that were not raised by petitioners in their prior direct appeal.

The lower court's attempt to analogize to habeas corpus procedures was not entirely without basis. We have explained that, in certain respects, the prima facie inquiry under section 1172.6 is "analogous" to the prima facie inquiry in habeas corpus proceedings. (*Lewis, supra*, 11 Cal.5th at p. 971 [citing habeas corpus procedural requirements, including taking a petitioner's factual allegations as true and generally prohibiting credibility determinations and factfinding prior to an evidentiary hearing]; *Patton, supra,* 17 Cal.5th at pp. 564–566 [adopting habeas corpus requirement prohibiting conclusory allegations from establishing a petitioner's prima facie burden].) However, we have also cautioned that habeas corpus process "does not seamlessly map onto the section 1172.6 process." (*Patton*, at p. 565.) Section 1172.6 is its own statute, and, in many respects, the section 1172.6 petition processes are distinct from those utilized in habeas corpus. (*Patton,* at p. 565, fn. 7.) Ultimately, like other questions of statutory interpretation, whether section 1172.6 procedures mirror those governing habeas corpus petitions is a question of legislative intent. Mindful of the lack of textual support for the holding below, we review the purposes of the *Dixon* bar and assess whether the purposes of the resentencing procedure sufficiently align with those served by the *Dixon* bar that we should assume the Legislature intended to incorporate the bar into section 1172.6.

As we have explained, the *Dixon* bar, "[b]y insisting on presentation of claims on appeal if reasonably possible, . . .

speeds resolution of claims, avoids delay, and encourages the finality of judgments." (*In re Reno* (2012) 55 Cal.4th 428, 490.) There is no affirmative evidence the Legislature intended to incorporate a procedural bar addressing these concerns in enacting section 1172.6. To the contrary, the general premise of section 1172.6 proceedings is to enable a careful review of petitioners' (often final) cases to determine whether the petitioners may have been sentenced under now-invalid imputed malice theories. Senate Bill 1437, and the amendment of that bill by Senate Bill 775 to clarify its expanded scope, plainly contemplated that traditional concerns regarding finality of judgments would have to yield, at least in cases like the one at hand, in which instructions may have allowed imputation of malice. To serve the statute's overall purpose, courts must "ensure that murder culpability is commensurate with a person's actions, while also ensuring that *clearly meritless* petitions can be efficiently addressed as part of a single-step prima facie review process." (*Lewis, supra,* 11 Cal.5th at p. 971, italics added.) Incorporating a *Dixon* bar, untethered from the *merits* of petitioner's theory of imputed malice, would not effectively serve these purposes.

Nor would imposing this procedural bar encourage presentment of claims to prior trial or appellate courts. In most cases, including Lopez's, section 1172.6 petitioners' trials and appeals had concluded by the time Senate Bill 1437 had passed, meaning that adopting a *Dixon*-like bar could have no impact in encouraging litigants to present claims at an earlier juncture. In sum, the analogy to habeas corpus is inapt. To the extent that some of our cases have looked to habeas corpus doctrine to guide prima facie analysis when doing so *served* the purposes of section 1172.6 (*Patton, supra,* 17 Cal.5th at pp. 564–566; *Lewis,*

*supra*, 11 Cal.5th at p. 971), the analogy provides no support when purposes of habeas corpus doctrine conflict with the goals established by section 1172.6.

> 4. Additional issues raised by the Attorney General

For the first time in this court, the Attorney General proposes an alternative basis for concluding that Lopez is ineligible for relief at the prima facie stage. He urges that we incorporate, as another layer of analysis to establish eligibility at the prima facie stage for claims based on instructional ambiguity, the "analogous" standard applicable to claims of instructional error on direct appeal articulated by the high court in *Boyde v. California* (1990) 494 U.S. 370. (See *id.* at p. 380 [where a "claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation . . . the proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction in [a constitutionally improper] way"].) The question of whether satisfaction of the *Boyde* standard is necessary to establish prima facie eligibility under section 1172.6 is outside the scope of the question presented. (Cal. Rules of Court, rule 8.516.) We therefore decline to address it.

## III.   DISPOSITION

We reverse the judgment of the Court of Appeal.   The cause is remanded to the Court of Appeal for further proceedings consistent with the views expressed herein.

**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**WILSON, J.**[*]

---

[*]      Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Lopez

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 10/4/24 – 5th Dist.
**Rehearing Granted**

_____

**Opinion Nos.** S287814
**Date Filed:** April 30, 2026

_____

**Court:** Superior
**County:** Stanislaus
**Commissioner:** Nancy A. Leo

_____

**Counsel:**

Cliff Gardner, under appointment by the Supreme Court, and Daniel J. Buffington for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Michael P. Farrell and Susan Sullivan Pithey, Assistant Attorneys General, Eric L. Christoffersen, Seth K. Schalit, Chung L. Mar, Christina Hitomi Simpson and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

Thien Ho, District Attorney (Sacramento), and David R. Boyd, Deputy District Attorney, for the Sacramento County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cliff Gardner
Attorney at Law
1448 San Pablo Avenue
Berkeley, CA 94702
(510) 524-1093

Idan Ivri
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6168